Bellacosa, J.
(dissenting). The majority, in affirming this conviction, adopts the Appellate Division’s central premise that the trial court’s complete failure of compliance with the conceded obligation to respond to a note from the deliberating jury was not prejudicial and did not affect the ultimate verdict (140 AD2d, at 354). Because we believe it is entirely speculative to find lack of prejudice and lack of causal effect in this record, and because the evidence of defendant’s guilt was weak rather than overwhelming as required to excuse a *968 judicial failure to fulfill the statutory obligation with respect to the most sensitive matters pertaining to a deliberating jury, we respectfully dissent and vote to reverse and order a new trial.
In this case, the trial court’s acceptance of the verdict, without notice, without inquiry, and without response to an outstanding jury request, was a patent violation of CPL 310.30 and was prejudicial error which may have spurred the guilty verdict out of this jury. It had been deliberating two and one-half days and had previously sent several deadlock notes.
Defendant stands convicted of criminal possession of a weapon and of a controlled substance. He was arrested in his neighborhood after police arrived to investigate his alleged interference with fire fighting efforts during a heavy snowstorm as he attempted to move his car from its parking place with the aid of neighbors. The officers searched, handcuffed and placed him in the rear of their squad car. The police testimony is that he pulled a revolver on them while en route to the station house. Defendant, testifying on his own behalf, denied possessing or drawing the weapon and maintained that he was the victim of police harassment throughout the episode. In sum, resolution of the case turned on whose version of events the jury believed.
The jury began its deliberation just past noon on Wednesday, the fifth day of the trial. In its final instruction before sending the jury to deliberate, the court emphasized that if there were differing opinions in the jury room, the minority of the jurors should listen to the majority because "it could be that the eleven are right and the one is wrong”. Despite a vigorous defense consisting of defendant’s own testimony and other witnesses on his behalf, and despite sharply conflicting versions among many witnesses as to what had transpired, the Trial Justice apparently anticipated brief deliberations and informed the jurors that lunch would arrive in 45 minutes but that they should not be reluctant to reach a verdict before that time because they were entitled to lunch even if they were no longer deliberating when it came.
The jury was also given the standard "interested witness” instruction. The court defined an "interested witness” and stated that the question of whether a particular witness was "interested” was for the jury to decide. The court then gave a specific illustration: "Obviously, the defendant, Mr. Agosto, has the primary interest in the outcome of the trial. Indeed, *969 he is the defendant. Whether his wife, Primative Agosto, who testified in this trial is concerned for her husband’s future welfare, whether that concern is sufficiently strong to make her interested in the outcome of the case, that is for you to decide applying the definition that the court has given you.”
Defense counsel objected because the instruction mentioned defendant and his wife as interested without correspondingly alerting the jury that the police officers might also be interested in the outcome of the criminal case because of the civilian complaint that they mistreated defendant. The objection was overruled.
The jury deliberated for over 14 hours during the course of the next two and one-half days. During the first two days, the jury sent the Trial Justice eight notes requesting further guidance and information. All eight notes were answered. In three of these notes, the jury stated they were deadlocked— evident manifestation of the closeness of this relatively simple credibility case. In response to these deadlock messages, the trial court pressed the jury to continue deliberating until a verdict was reached. The court prodded the jury that "there can be no reflection upon any juror for changing his own opinion” and urged them not "to pass the buck”.
At 11:05 a.m. on Friday, the third, and as it turned out the last, day of deliberations, the jury sent out a ninth note which read: "Your Honor, Mrs. Kaufman and I are Sabbath observers and, therefore, we would like to request that we be dismissed before sundown to prepare for the Sabbath period. Thank you” (emphasis added). The note was signed by the forelady, Mrs. Goldstein.
The Trial Justice did not inform counsel that he received the note and did not order the jury returned to the courtroom so that he might answer it. At 11:30 a.m., without inquiring about the effect of the outstanding note, if any, the court accepted the jury’s verdict convicting defendant on both counts. At some unknown point and with no notice, so far as the record shows, to the necessary participants, especially counsel, at the critical deliberations time, the note was marked as an exhibit and placed in the court’s case file. This note apparently was not discovered by or disclosed to the defense counsel until defendant’s sentencing.
The precise and mandatory procedure to be followed by courts when deliberating juries request additional information is set forth in CPL 310.30. It provides: "At any time during its *970 deliberations, the jury may request the court for further instruction or information with respect to the law, with respect to the content or substance of any trial evidence, or with respect to any other matter pertinent to the jury’s consideration of the case. Upon such a request, the court must direct that the jury be returned to the courtroom and, after notice to both the people and the counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper” (emphasis added).
The statute vests discretion in the court only as to the tail end of the statutory prescription; that is, to determine how much and what to respond to a request or inquiry from the jury (People v Malloy, 55 NY2d 296, 302). The majority hypothesizes that this note denoting an anxiety about terminating deliberations by a fixed external deadline is governed by CPL 310.30. We believe that to conclude otherwise would render the statute meaningless because the provision could not reasonably be read to require lay jurors to use the statutory words or other legal jargon to prove pertinency "of any other matter”.
In any event, the statute affords no discretion to refuse to answer or, as in this case, to ignore the request entirely. While we agree that the failure to comply with the statutory command to respond to a jury’s request for information during deliberations does not amount to per se reversible error, we strongly disagree that reversal is not required here, where the record supports the conclusion that the lapse seriously prejudiced the defendant (People v Lourido, 70 NY2d 428, 435).
The trial court failed to mention, to give notice to counsel, to inquire about or to respond at all to the jury’s request (see, People v Mehmedi, 69 NY2d 759, 760; People v Ahmed, 66 NY2d 307, 310). These derelictions cannot be pardoned as nonprejudicial in this case. First, the evidence of appellant’s guilt was extremely weak. It was sharply contradicted and of a most suspicious quality arising out of a volatile urban street clash between citizen and police. It came solely from the arresting officers who, according to defense witnesses, provoked the alleged criminal incident. According to the prosecution, the police were called to the scene of a fire during a heavy snowstorm and were informed that defendant’s car was blocking a fire fighting effort. When the police officers approached, defendant was said to be belligerent and refused to produce his license and registration. The police then at *971 tempted to arrest defendant. There was a scuffle and physical force was used to subdue him. Defendant’s hands were handcuffed behind his back and he was frisked. No weapons were discovered. Defendant was placed in the back seat of the squad car. On the way to the station house, defendant, with his hands still cuffed behind his back, drew — apparently in Houdini-like fashion — a loaded two-shot derringer from his pants and pointed it at one of the officers. A struggle ensued until the officers were able to overcome the defendant by striking him in the head several times with their nightsticks. When they arrived at the precinct, defendant was strip-searched and was found to be in possession of three tinfoil packets of cocaine.
Defendant’s version of what transpired differed. He admitted the cocaine possession but denied possessing or pulling the gun. Defendant testified that the gun was on the back seat when he was placed in the squad car and that it was one of the officers who retrieved it. They then struck the defendant repeatedly with a nightstick. Defendant also testified that the incident in the squad car was a continuation of the police harassment which had begun at the fire-snowstorm scene. Defendant contended that he did produce identification, but that the police knocked it from his hands and pushed him against the car. Defendant denied ever striking either officer and maintained that the police were the ones who struck him without provocation.
Further, all the defense witnesses contradicted the officers’ version of what happened at the time of defendant’s arrest before he was placed in the squad car. The defense eyewitnesses, including defendant’s wife of 19 years and two of defendant’s neighbors who were helping him move his car, testified that defendant was beaten without provocation when he tendered his car registration to the officers, that he was searched thoroughly before being placed in the squad car, and that defendant never raised a hand to either of the arresting officers. Of course, only the officers and the defendant know what happened in the squad car and they offered completely divergent stories.
This is, thus, a classic credibility case and a very close one at that. It is not surprising, then, that the jury deliberated for two and one-half days after a short trial or that it repeatedly declared itself to be deadlocked. The deliberations came to an abrupt and adverse end for defendant shortly after the ninth and last note was sent expressing the anxiety of two jurors *972 about possible interference with their Sabbath observance. In view of the history as to what had transpired in this trial and in the lengthy prior deliberations, it cannot be reasonably disputed that those jurors were expressing a pertinent and conscientious concern and potential conflict in their responsibilities. Also not susceptible to serious debate is that no one can ever know, because of how the Trial Justice handled the situation, to what extent the jurors’ anxieties accelerated and nudged the unanimous resolution of this case against this defendant. Surely, if there is a doubt or if there is to be a contest of speculations, the convicted defendant should be granted the benefit, for up to the critical moment he was presumed innocent.
Nowhere in this record can any support be found for the bald assumptions of the majority that the jurors were "highly unlikely” to "attach any significance” to the lack of response to the note, that it was "most improbable” that the failure to respond had any effect on the deliberations, and that "a consensus presumably” had formed at some point earlier than the sending of the note (majority mem, at 966). These are not assumptions, in any event, based on reasonable experience of how lay jurors act. The reason there is nothing in the record is the trial court failed to do what the statute commanded. The majority thus inflicts a legal Catch-22 on this defendant and apparently would dispense with the application of an important statutory protection based on how many minutes or hours elapse between a note request and a response or nonresponse. The statute contains no such time test. In sum, the available inferences strongly preponderate that the trial court’s failure to respond to the note substantially prejudiced the defendant and it is far more likely that the guilty verdict, constituting a serious miscarriage of justice in this case, was legally coerced.
While perhaps not reversible error in and of itself, additional prejudice may have been injected into this jury’s deliberations by way of the one-sided interested witness instruction given by the trial court. In this one-on-one credibility duel, the court spotlighted the defendant and his wife as interested witnesses while blinking the significant personal and professional interests of the police officers. The illustration by the Trial Justice to the jury may have vouched for the credibility of the police officers while undermining that of the defendant and his witnesses.
*973 Defendant was seriously prejudiced and was deprived of a fair trial and of an untainted verdict. We should simply hold that a verdict may not be accepted when a jury note of this kind and in these circumstances is outstanding without any inquiry as to whether the request affected the rendition of the verdict.
For these reasons, the order affirming the conviction should be reversed and a new trial should be ordered.
Chief Judge Wachtler and Judges Simons, Alexander and Hancock, Jr., concur; Judge Bellacosa dissents and votes to reverse in an opinion in which Judges Kaye and Titone concur.
Order affirmed in a memorandum.